[Cite as *State v. Angel*, 2021-Ohio-4322.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                         :

    Plaintiff-Appellee,                        :                  No. 19AP-771
                                                           (C.P.C. No. 17CR-4241)

v.                                                    :

                                                               (REGULAR CALENDAR)

Zhontel Angel,                                        :

    Defendant-Appellant.                       :

---

D E C I S I O N

Rendered on December 9, 2021

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. ***Argued:*** *Seth L. Gilbert.*

**On brief:** *Campbell Law Offices*, and *April F. Campbell*, for appellant. ***Argued:*** *April F. Campbell.*

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Zhontel Angel, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of murder and an associated firearm specification. For the following reasons, we affirm the judgment of the Franklin County Court of Common Pleas.

## I.    FACTS AND PROCEDURAL HISTORY

{¶ 2} As described by defense counsel, this case is "not a whodunit." (Tr. Vol. II at 273.) Appellant shot James Lundy on July 25, 2017, and Lundy died of his wounds. On August 3, 2017, a Franklin County jury indicted appellant on one count of aggravated murder pursuant to R.C. 2903.01, one count of murder pursuant to R.C. 2903.02 for purposely causing the death of another, one count of murder pursuant to R.C. 2903.02 for causing the death of another as a proximate result of committing or attempting to commit

felonious assault, and one count of tampering with evidence pursuant to R.C. 2921.12. The aggravated murder and murder counts carried associated firearm specifications pursuant to R.C. 2941.145.

{¶ 3} Appellant entered a plea of not guilty. Prior to trial, plaintiff-appellee, State of Ohio, dismissed Count 3 of the indictment charging appellant with felony murder under R.C. 2903.02(B). The case then proceeded to a jury trial held in October 2019.

{¶ 4} Seth Casto, a patrol officer with the City of Columbus, testified that on July 25, 2017 at 2:55 p.m. his police substation received a 9-1-1 service call stating a shooting occurred on a street in his precinct. When he pulled up to the scene, the mood was "frantic" with people screaming and telling him conflicting information about whether the suspect was in the house or running down the street, and whether the suspect had a gun or not. (Tr. Vol. II at 290.) Upon approaching the house, Officer Casto encountered a woman who was shouting, "[t]hey came over to jump my brother." (Tr. Vol. II at 315.) She pointed him to a victim who she said had been shot, and he observed a man who appeared to be deceased lying in the yard with a large amount of blood on him.

{¶ 5} Officer Casto entered the house to search for more victims and clear the house from possible threats when he heard through his police radio that an officer had a possible suspect in custody down the street. Officer Casto approached the suspect, who he described as "physically upset"; the suspect was shouting to get him out of the area and saying, "they're going to kill me." (Tr. Vol. II at 298-99, 312, 317.) Officer Casto testified the suspect did not have any apparent physical injuries and did not, in his knowledge, ask for medical attention. The suspect was compliant, listening to the officers' commands, and was not holding any weapons in his hands. Officer Casto placed the suspect in handcuffs and put him in a police cruiser for the safety of the suspect and the officers. Officer Casto identified appellant in the courtroom as the suspect he encountered.

{¶ 6} Officer Casto returned to the shooting site and assisted in preserving evidence, including multiple shell casings. Officer Casto testified he did not observe any blood inside the house or on the steps or stoop of the house, any damage to the front door aside from a missing doorknob to the storm door, or any damage to the front windows to the house. Body camera footage depicting Officer Casto's experience was played for the jury.

{¶ 7}  Next, Brian Becker, a patrol sergeant for the Columbus Police Department, testified to responding to a service call for a reported shooting in the area.  According to Sergeant Becker, at the time the call about the shooting came in, an initial domestic violence call was already "pending" for the same address; the domestic violence service call had been "held for a shift change."  (Tr. Vol. II at 357.)  Once at the scene, Sergeant Becker saw a person he identified in the courtroom as appellant coming from the north about one house away.  Sergeant Becker commanded appellant at gunpoint to stop, kneel, and put his hands in the air, and appellant complied.  Sergeant Becker did not observe a gun anywhere near appellant and testified that he did not see any injuries or indications that appellant had just been assaulted.  Appellant did not ask for medical attention during the short time Sergeant Becker was with him.

{¶ 8}  Sergeant Becker testified that he assisted in securing the house.  In doing so, he did not see any signs of a fight in the house, signs of blood either in the house or on the stoop or front steps, or damage to the windows or front door other than a missing handle on the storm door.  According to Sergeant Becker, he encountered Christian Owensby, girlfriend of appellant and stepdaughter to Lundy, in the yard.  Christian, who was excited and crying, told Sergeant Becker, "they got out of the car and started hitting him."  (Tr. Vol. II at 355.)  Sergeant Becker's body camera footage was played for the jury.

{¶ 9}  Mark McMillen, a patrol officer with the City of Columbus, testified that on July 25, 2017 he was one of the last officers to arrive at the scene of the shooting.  He assisted in securing appellant in the cruiser, and, according to Officer McMillen, appellant never asked for medical attention and did not appear to be physically hurt.  Officer McMillen, who is 6 foot, 1 inches tall and weighs 195 pounds, noted appellant was taller and "a lot" more muscular than him.  (Tr. Vol. III at 558.)  Officer McMillen's body camera footage was played for the jury.  Officer McMillen confirms that, in the body camera footage, a woman can be heard saying, "these niggers just tried to kill my brother."  (Tr. Vol. III at 557.)

{¶ 10} Larry Shoaf, a crime scene search unit detective with the Columbus Police Department, testified to photographing the crime scene and compiling a report documenting the processing of the crime scene evidence.  The crime scene photographs depict a two-story duplex with each unit serviced by a side driveway.  A small sidewalk runs from the driveway to the foot of two front steps, which rise to a small entrance platform (or

"stoop") beneath the front door. An unenclosed, carpeted, concrete porch extends from the front stoop toward the middle of the duplex. Photographic evidence shows the porch is slightly lower than the two-step high front stoop. A grass yard fills the space between the duplex and the public sidewalk and street, and a large tree occupies the middle of the yard. According to the crime scene report admitted into evidence, the distance between the duplex's facade and the public sidewalk is approximately 26 feet. Lundy's body was found, face side up, at the base of the tree on appellant's side of the duplex yard; his head is oriented toward the house, at a distance of approximately 9 feet from the porch, with his feet toward the street. (Tr. Vol. II at 456-57.)

{¶ 11} Detective Shoaf testified that Lundy was found with a large wound in his chest that he believed to be a bullet wound. Detective Shoaf did not observe any markings on Lundy's face that would indicate he had been in a fist fight, and nothing that would be considered a weapon was found around Lundy's body. When Lundy's body was moved, Detective Shoaf documented two "impact holes" underneath where Lundy had been lying. (Tr. Vol. II at 412.) Based on Detective Shoaf's experience, he believed the holes were "bullet impacts" caused by a powerful firearm. (Tr. Vol. II at 414.) According to Detective Shoaf, the shape and depth of the hole depicted an impact into the ground at a steep rather than shallow angle; in other words, the bullets entered the ground at a steep, downward angle in relation to how the gun was pointed. (Tr. Vol. II at 416.) With this type of impact hole, Detective Shoaf explained there is a good chance a bullet will be found within the hole, and he did in fact locate a jacket from a projectile within one of the impact holes.

{¶ 12} Detective Shoaf testified that a high-powered rifle was not found at the scene, but nine spent shell casings compatible with a high-powered rifle were recovered: three in the yard (one between Lundy's body and the tree, one in the middle of the yard but slightly more near the street, and one in the middle of the yard but more near the front porch); two on the small sidewalk in front of the steps; three on the front porch; and one in the kitchen. One live round was also found in the kitchen; it was a 9 mm round not compatible with a high-powered rifle. He also photographed a white vehicle with an empty gun case that would fit a "SKS rifle." (Tr. Vol. II at 439.) According to Detective Shoaf, he did not observe any blood on the front steps, the porch, the driveway, sidewalk in front of the house, street, or rooms inside the house. He did not observe anything that would imply damage to the

door frame, such as splintering wood, damage to the glass or plexiglass in the storm door, or damage to the windows of the house.

{¶ 13} Detective Shoaf further testified to photographing appellant at police headquarters approximately three hours after the shooting. Detective Shoaf asked appellant if he had any injuries to document, and appellant stated he had a "busted lip," a scratch on his elbow, and his knees were hurting "a little bit." (Tr. Vol. II at 443.) Appellant did not ask Detective Shoaf for medical attention, and nothing Detective Shoaf observed caused him to believe medical attention was needed. Photographs of appellant's lip, arm, and knees appear in the record. The parties stipulated to evidence showing appellant tested positive for gunshot residue collected by Detective Shoaf.

{¶ 14} On cross-examination, Detective Shoaf agreed that if a person was standing on the front porch nine feet away from Lundy, a high-powered rifle could make the impact holes found beneath Lundy's body and specified, "[i]t all matters on where the * * * rifle is pointed." (Tr. Vol. II at 462-63.) When asked on re-direct whether a person "basically standing over" a person on or nearly on the ground would also result in a steep angle consistent with the impact holes, Detective Shoaf replied, "[y]ou're basically aiming the gun toward the ground in a downward angle, so * * * it's just the direction that the firearm was aimed at." (Tr. Vol. II at 467.) In other words, Detective Shoaf testified he could not determine where the shots were fired from based on the impact holes. (Tr. Vol. II at 468.) Detective Shoaf also agreed during cross-examination that he could not tell how far shell casings ejected from the gun would go, although he did note that the casings would be ejected to the right of a gun. (Tr. Vol. II at 465.)

{¶ 15} Brian Johnson testified as an expert in firearm and ballistics analysis. According to Johnson, the eight, 7.62-by-39 mm shell casings found outside of the house were fired from the same firearm and were consistent with ammunition for a SKS rifle. According to Johnson, an SKS rifle is a semi-automatic rifle that, if not modified, requires a person to pull the trigger for each bullet to fire. Johnson testified that a ninth shell casing found in the kitchen was actually an "unspent 7.62-by-39 millimeter cartridge case"—it had not been fired. (Tr. Vol. II at 488.) Johnson could not make any conclusions about the spent jacket fragment found in the impact hole since he did not have the weapon used in the shooting or other bullet fragments to create comparisons.

{¶ 16} Donald Pojman, M.D., deputy coroner for Franklin County, testified as an expert in forensic pathology and determination of causes of death. On July 26, 2017, Dr. Pojman performed an autopsy on Lundy, who was 31 years old, 5 foot 8 inches tall, and 155 pounds. According to Dr. Pojman, Lundy had three gunshot wounds: wounds to his chest, pelvis, and thigh. Examination of the chest wound showed a bullet entered the left side of his lower anterior chest and exited on the right side of the anterior chest wall. Dr. Pojman testified that the bullet traveled in an "upward" and left-to-right direction. (Tr. Vol. III at 523. *See also* Ex. H, Coroner's Report at 2.) The pathway intersected the ribcage, bruised the left lung, and struck the right side of the heart and two lobes of the right lung before exiting the body. Examination of the pelvis wound showed a bullet entered Lundy's upper left buttock and exited his front pelvis area, causing the small intestines to exit the body. The bullet traveled back-to-front, slightly left-to-right, and slightly downward. (Tr. Vol. III at 527-28. *See also* Ex. H, Coroner's Report at 3.) Finally, the thigh wound showed a bullet entered the lateral, or outer, portion of Lundy's left thigh, striking and shattering the femur. The pathway of the bullet was left-to-right and "upwards." (Tr. Vol. III at 531. *See also* Ex. H, Coroner's Report at 3.)

{¶ 17} Dr. Pojman testified that no gunshot entrance wounds were found on the front of Lundy's body. (Tr. Vol. III at 533.) All entrance wounds were on the left lateral side of the body or the back of the body, and Dr. Pojman testified that the barrel of the gun would correspondingly be to the left or behind Lundy to produce those wounds. Dr. Pojman testified none of the wounds had "stippling," which accompanies close range gunshots "18, 24 inches, even farther depending on the weapon" from the body, or "soot," which accompanies close range gunshots a few inches from the body. (Tr. Vol. III at 542.) Dr. Pojman agreed that he could not determine how Lundy was positioned when he was shot or the order in which the wounds occurred. According to Dr. Pojman, the gunshot wounds to the pelvis and thigh would have caused Lundy to collapse immediately, and the gunshot wound to the chest would have immediately incapacitated Lundy.

{¶ 18} Dr. Pojman testified that Lundy had some small or slight abrasions and scrapes on the rest of his body, but no abrasions or lacerations were noted on Lundy's right hand or knuckle-portion of either hand. According to Dr. Pojman, the immediate cause of Lundy's death was the gunshot wound to the chest, with the gunshot wounds of the pelvis

and left thigh as other significant conditions.  (Tr. Vol. III at 536.  *See also* Coroner's Report at 2-3.)

{¶ 19} Three witnesses to the shooting testified next: Christian Owensby; her mother Lila Wright; and her brother Calill Owensby.  Christian testified to having an "up and down" romantic relationship with appellant and having three young children with him. (Tr. Vol. III at 576.)  Appellant knew and interacted with Christian's mother (Wright) and her "stepdad" (Lundy) without prior issues or arguments.  (Tr. Vol. III at 577.)  Appellant also had a "pretty good" relationship with Christian's two brothers (Christopher Jr. and Calill); they had gone to the same high school and played basketball together.  (Tr. Vol. III at 579.)

{¶ 20} Christian testified that she and her kids generally resided with her biological father, but that she would stay with appellant for short periods of time.  On the day of the shooting, Christian and the children had been staying with appellant for two or three days. On July 25, 2017, sometime around mid-morning, Christian and appellant began arguing, and appellant broke Christian's phone.  The argument then turned physical when appellant "started nudging [her] in the head, but harder and harder each time" until appellant's sister, Diandrea Angel, who also lived with appellant, intervened.  (Tr. Vol. III at 588.)

{¶ 21} Christian moved outside to the porch with her children in an attempt to diffuse the situation.  She used Diandrea's cell phone to call Wright, told Wright appellant had "put his hands on [her]," and asked her to hurry and come get her.  (Tr. Vol. III at 593.) Christian testified that Wright came to appellant's house, bringing Lundy, Lundy's brother, and Christian's two brothers with her in Lundy's silver or grey sedan.

{¶ 22} According to Christian, Wright and Lundy exited the vehicle while her brothers and Lundy's brother initially stayed in the car.  While Christian gathered her belongings, she heard Lundy say, "What's up, Telly?" (his nickname for appellant), followed by what she assumed to be a punch thrown by Lundy.  (Tr. Vol. III at 599-600.)  Christian testified that Lundy told appellant to stand up, and the two began fighting—throwing punches and wrestling on the ground. At that point, according to Christian, the three other men exited the car and attempted to break up the fight.  The group was "tussling on the ground" in appellant's yard, and Diandrea joined the affray by trying to kick Lundy.  (Tr. Vol. III at 603.)  Christian did not recall if her brothers and Lundy's brother threw any

punches; however, she agreed she told an officer "[t]hey all starting hitting him." (Tr. Vol. III at 606.) Christian testified she screamed for the fight to stop, and pleaded "don't hurt him, the kids" and noted her children were witnessing the fight. (Tr. Vol. III at 604.) The fight ended, and, according to Christian, her brother Calill walked up to appellant and repeatedly asked him to take a walk, but appellant shook his head "no" and walked back inside of the house. (Tr. Vol. III at 608-09.)

{¶ 23} Christian testified that Lundy began picking up items in the yard that he had dropped during the fight, and the other men were either at or headed toward their car. (Tr. Vol. III at 611-12.) According to Christian, after the fight ended, she did not observe Lundy or the other men make any threats toward appellant, attempt to get inside of the house, or arm themselves with weapons. (Tr. Vol. III at 628.) Christian confirmed that Lundy was not on the porch, the front steps, or the small sidewalk in front of the entrance at that time.

{¶ 24} After a minute or two, appellant returned to the doorway, stepped out onto the porch, and started shooting "a lot" at Lundy using a gun that looked like the SKS rifle presented at trial. (Tr. Vol. III at 613-14.) Christian testified that Lundy "was trying to run" with her mom when he was shot and he did not have any weapons in his hands. (Tr. Vol. III at 616.) Lundy fell to the ground, and appellant walked over, looked down at him, and shook his head.

{¶ 25} Christian testified that appellant then walked away; she took her children in the opposite direction and hid. According to Christian, she first attempted to give her children to Diandrea, but then appellant approached Diandrea's car and tried to hand Diandrea his gun. Christian fled, and asked neighbors to take the children. Appellant followed, with gun in hand, telling Christian "it's [her] fault, this is because of [her]." (Tr. Vol. III at 626.) The neighbors took Christian and her kids inside, and appellant again approached, this time without the gun, kissed all three children and walked away. Christian described appellant's demeanor during these incidents as angry, but not out of control, and then "calm." (Tr. Vol. III at 629.)

{¶ 26} On cross-examination, Christian testified that the sedan that Wright came to pick her up in could seat five individuals comfortably, and Wright arrived with four other people. On redirect, Christian testified that she was made aware that her biological father was also separately on his way to appellant's house. Christian on cross-examination also

admitted that on July 25, 2017, she told officers, "[t]hey were jumping him," and also used the word "they" in speaking to a detective that day and told the detective, "[e]veryone is fighting." (Tr. Vol. III at 647, 649, 657.) Christian agreed there were details that she did not tell the officer or detective on the day of the shooting. On redirect, Christian agreed the shooting was a traumatic experience, she was "hysterical" when she spoke to officers and the detective on the day of the shooting, and that after she became less hysterical, she remembered more details of the event. (Tr. Vol. III at 674.)

{¶ 27} Christian's mother, Lila Wright, testified that on July 25, 2017, she received a call from Christian asking to be picked up from appellant's house because they were arguing. Wright told her she would have to wait until Lundy came home from work. Christian called back, telling her the argument was getting more physical, and Wright called Christian's biological father to ask if he could go pick her up. Shortly thereafter, around 2:50 p.m., Lundy got home and Wright, Lundy, Lundy's brother, and Christian's two brothers got in the car and headed to appellant's house. On the way, Wright called 9-1-1 because she knew appellant had guns and she was afraid he might hurt Christian. The 9-1-1 call was played for the jury.

{¶ 28} Wright testified that when they arrived, she and Lundy exited the car, and she told the other men to remain in the car; Christian's father had not yet arrived. Lundy and appellant then exchanged greetings. When she turned around to speak to her grandkids, Lundy and appellant started fighting, ending up on the ground and "locking up together and throwing blows." (Tr. Vol. III at 702.) At that point, according to Wright, the other three men exited the car to help break up the fight; Diandrea tried to break up the fight as well, and Christian was screaming for the fight to stop. After about 30 seconds to 1 minute of fighting, they were eventually successful in getting Lundy and appellant apart from each other. Calill then spoke to appellant on the sidewalk while Wright and Lundy started picking up Lundy's belongings from the yard. Wright testified, "[t]he situation had calmed down all the way," and she and Lundy were preparing to leave. (Tr. Vol. III at 706.)

{¶ 29} According to Wright, appellant pulled away from Calill and went inside the house. The door closed behind him completely, and no one followed him or engaged with him. After about one minute, when Wright and Lundy were walking in the vicinity of the tree with their backs to the house, she heard the door shut again and turned. Wright saw

appellant with a gun.  Appellant aimed at Lundy and, without speaking or hesitating, shot Lundy multiple times.  Lundy tried to run but was not able to and instead fell to the ground where he had been standing.  According to Wright, Lundy did not have any weapons. Wright testified that appellant hovered over Lundy's body, and she fled and called 9-1-1. The second 9-1-1 call was also played for the jury.

{¶ 30}  On cross-examination, Wright agreed that, having just seen Lundy shot and killed, she may not have told the police every detail she testified to at trial but that "things started coming back to [her] after time went on and [she] wasn't upset or distraught."  (Tr. Vol. III at 757.)  Wright denied that she and the others went to appellant's house with the purpose of fighting him, and confirmed she called 9-1-1 prior to going to appellant's house.

{¶ 31}  A portion of Wright's interview with a detective on the day of the shooting was played, which established that Wright told police only she and Lundy initially got out of the car, the other men got out of the car to try to break up the fight, once the fight ended Calill attempted to walk appellant down the street, and that Christian's father was coming over to pick her up.  On cross-examination related to the interview, Wright agreed she did not tell police about Lundy picking up a wallet, hearing Lundy state, "Oh, I'm shot," or appellant hovering over Lundy's body.  (Tr. Vol. III at 783.)  She agreed she told police that Lundy was on appellant's porch but explained that Lundy was on the porch during the fight and not after the fight ended.

{¶ 32}  Calill Owensby, Christian's brother, testified that he was present when Wright received a call from Christian, and Calill joined the others in driving to appellant's house "[b]ecause [he] wanted to make sure [his] sister was okay" and to make sure his dad arrived to pick her up.  (Tr. Vol. IV at 827.)  According to Calill, when they arrived, Lundy and Wright got out of the car while he, his brother (Chris Jr.), and Lundy's brother stayed in the car.  Initially preoccupied with his phone, Calill's attention was drawn to the porch when he heard a fight break out.  Calill, Chris Jr., and Lundy's brother got out of the car and tried to break up the fight between appellant and Lundy, which was occurring by the front porch.  Calill testified that they did not hit or kick appellant.  The fight was short and lasted about one minute.  Calill then attempted to get appellant to take a walk, but appellant walked back to the house and went inside.  According to Calill, no one followed appellant onto the front porch or tried to break down the door.  "We thought everything was over * * *

like they fought and it was over.  We thought everything was okay, we would be about to just get in the car and leave."  (Tr. Vol. IV at 840-41.)

{¶ 33}  However, Calill testified that after about 30 seconds, appellant came out of the house with a rifle, said, "[y]ou guys came over here to jump me," and started shooting at Lundy who, at the time, was near the tree in the yard.  (Tr. Vol. IV at 842.)  Calill testified that as he was shooting, appellant "started to walk off the porch."  (Tr. Vol. IV at 849.)  Lundy fell, and appellant continued to shoot at Lundy.  Appellant stopped shooting and walked toward Lundy with the gun still with him, looked at Lundy "with a smile on his face and shook his head no."  (Tr. Vol. IV at 843-44.)  According to Calill, Lundy did not have a weapon and was not a threat to appellant.

{¶ 34}  Christopher Owensby, Sr. testified that Wright called him on July 25, 2017 and stated his daughter Christian needed picked up from appellant's house because appellant had "put his hands on her."  (Tr. Vol. III at 792.)  He drove his five-passenger pick-up truck from Pickerington to appellant's house.  Prior to arriving, he received a call from Christian asking him to hurry; it sounded like she was crying and running.  She seemed scared and frantic to Christopher.  When he arrived, police caution tape blocked off appellant's house.  After at least one hour, Christopher was able to take Christian and her children away from that location.

{¶ 35}  Detective Martin Kestner testified to interviewing appellant on the day of the shooting at Columbus police headquarters.  According to Detective Kestner, appellant appeared to have a "puffy lip" and mentioned a loose tooth but did not ask for medical attention. (Tr. Vol. IV at 891-92.)  Detective Kestner explained that the recording device failed to initially start recording, so he asked appellant questions again during a second interview.  Detective Kestner testified as to what appellant said during the unrecorded initial interview; the recorded second interview was played for the jury.  According to Detective Kestner, appellant's answers were fairly consistent in both interviews.

{¶ 36}  Detective Kestner testified that appellant stated that on the day of the shooting, he and Christian had an argument, so they waited outside for her family to come pick her up.  According to Detective Kestner, in the initial, unrecorded interview, appellant stated a car arrived and several people exited: a woman, Lundy, and one other person.  In the second, recorded interview, appellant states that Lundy and Wright exited the car.

{¶ 37} Appellant told Detective Kestner that Lundy, who was wearing "fighting clothes," walked directly up to him, said something to him, and struck appellant in the face. (Tr. Vol. IV at 909.) The rest of the men then "jumped on him * * * he was taken to the ground and * * * several people were on top of him" and, at some point, Lundy blocked the front door to the house. (Tr. Vol. IV at 898.) Appellant told Detective Kestner that he had a shoulder injury that hindered his ability to fight, but that he was eventually able to get away from the group. Once he was free, one of Christian's brothers tried to stop or detain him. However, appellant was able to go inside of the house and a screen door closed behind him. After about a minute, appellant retrieved an SKS rifle from the living room. Appellant told Detective Kestner that he came back outside with the rifle and saw that Christian's family had not left the yard and were still being "aggressive toward him." (Tr. Vol. IV at 901.) Appellant admitted he aimed at Lundy and fired the rifle. Detective Kestner testified appellant stated that after the shooting he dropped the rifle in the yard.

{¶ 38} Detective Kestner asked appellant several times whether Lundy said something that pushed him to a snapping point, made him very angry, or put him in fear for his life, and appellant replied "no" each time. (Tr. Vol. IV at 903, 914-16.) Appellant denied being out of control. *Id.* He told Detective Kestner, "I got the gun for my own safety because I was virtually defenseless," and believed by going back outside with the gun, the group would be convinced not to jump him again and leave. (Tr. Vol. IV at 915.) He told Detective Kestner that nobody tried to break down the door or follow him in the house. Detective Kestner asked appellant why he did not stay in the house, lock the door, and call the police, and appellant did not give a clear answer.

{¶ 39} According to Detective Kestner, appellant explained that once he returned outside, Lundy was not on the porch but was still in the yard "jumping around," waving his arms, and being "hostile" and "aggressive." (Tr. Vol. IV at 931-33.) Appellant stated Lundy was talking trash and told him, "bitch-ass nigger, you're going to get some more"; it appeared to appellant that the group was "waiting on" appellant and was not "finished with him." (Tr. Vol. IV at 932-33 and Ex. K.) He was worried about getting jumped again and also "didn't know if they would come inside the house at some point in time." (Tr. Vol. IV at 931.) On the recording, appellant did not say he felt like he was going to die or had no choice but to shoot Lundy, and he did not say Lundy or anyone in the group had a weapon.

According to Detective Kestner, appellant told him he aimed and shot at Lundy's legs and acted in self-defense.  (Tr. Vol. IV at 931-33.)

{¶ 40} Appellee then rested its case.  Appellant moved for a Crim.R. 29 acquittal, which the trial court denied.  Appellant rested its case as well, and the parties and the trial court proceeded to discuss proposed jury instructions.  Based on the evidence presented, the trial court determined an instruction on self-defense was appropriate, but not voluntary manslaughter.   Specific to the instructions on self-defense, appellant proposed an instruction that omitted the language, "[d]efendant raises the affirmative defense known as self-defense" because he believed appellant no longer had a duty to raise self-defense under new statutory authority, and requested the court add additional self-defense related text. (Tr. Vol. IV at 986-87.)   The trial court declined to include appellant's version of the instruction.  Appellant also requested language on the "duty to not retreat."  (Tr. Vol. IV at 987.)  Appellee pointed to language already in the instructions; the trial court found that language sufficient, and appellant did not object to that instruction.  (Tr. Vol. IV at 987-88.)

{¶ 41} Each party made their closing arguments.  The trial court then distributed copies of the final jury instructions to the jury and orally recited the instructions.  The jury retired for deliberations and, thereafter, appellant sought to "renew [his] objection to the jury instructions in the form that they went back to the jury."  (Tr. Vol. IV at 1080.)  The jury ultimately found appellant guilty of murder for purposely causing Lundy's death and the associated firearm specification, and not guilty of aggravated murder and tampering with evidence.  The trial court imposed a sentence of life imprisonment without parole eligibility for 15 years served consecutively to 3 years imprisonment on the firearm specification for a total sentence of life imprisonment with parole eligibility after 18 years.

{¶ 42} Appellant filed a timely appeal.

## II.    ASSIGNMENTS OF ERROR

{¶ 43} Appellant submits seven assignments of error for our review:

> I.      Angel's murder conviction must be reversed because the trial court instructed the jury that Angel had a duty to retreat when he did not.
>
> II.     Angel's murder conviction must be reversed because the trial court's instructions on self-defense were conflicting and confusing.

III.     The trial court committed reversible error by refusing to give a voluntary manslaughter instruction.

IV.     The prosecutions misconduct in this case caused prejudicial error, requiring reversal of Angel's murder conviction.

V.      The State's evidence that Angel did not act in self-defense was legally insufficient, requiring reversal of Angel's conviction.

VI.     Angel's conviction should be reversed because the evidence weighed manifestly against convicting him of murder.

VII.    Angel's conviction should be reversed due to multiple errors, which cumulatively caused him prejudice.

## III.  ANALYSIS

{¶ 44} With his seven assignments of error, appellant challenges the jury instructions and sufficiency and manifest weight of the evidence and asserts misconduct by the prosecution and cumulative error. Appellant raises issues concerning the burden of proof and duty to retreat for self-defense, implicating statutes that have recently been amended. The specific version of the statutes relevant to this case are noted throughout the decision. Having reviewed each of the matters raised by appellant, we affirm appellant's convictions.

### A.  Sufficiency and manifest weight of the evidence

{¶ 45} For clarity of discussion, we will address the assignments of error out of order, beginning with appellant's challenge to the sufficiency and manifest weight of the evidence. "Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict." *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Kurtz* at ¶ 15. In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 46} "In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction." *Kurtz* at ¶ 16, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80. "Further, 'the testimony of one witness, if believed by the jury, is enough to support a conviction.' " *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 33, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 47} "Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence." *State v. McCombs*, 10th Dist. No. 15AP-245, 2015-Ohio-3848, ¶ 3, citing *Thompkins* at 387. "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38.

{¶ 48} "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson* at ¶ 34, citing *Thompkins* at 387. "An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most ' "exceptional case in which the evidence weighs heavily against the conviction." ' " *State v. Jenkins*, 10th Dist. No. 18AP-324, 2018-Ohio-4988, ¶ 21, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 49} In reviewing the credibility of the witnesses, " 'we are guided by the presumption that the jury, * * * "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *Jenkins* at ¶ 22, quoting *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to

reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414.

{¶ 50} In this case, appellant was convicted of murder pursuant to R.C. 2903.02(A) which states: "No person shall purposely cause the death of another." There is no dispute that appellant aimed at Lundy with a high-powered rifle and shot him multiple times and the gunshots caused Lundy's death. However, at trial, evidence was introduced that a fight initiated by Lundy preceded that shooting and that appellant believed he shot and killed Lundy in self-defense. Based on the evidence, the trial court instructed the jury on self-defense.

{¶ 51} In *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 30-31, this court set forth the elements of self-defense in a deadly force case and employed the burdens stated in the newly amended March 2019[1] self-defense statute. Under the amended statute,

> [T]he prosecution [is] required to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger.

(Emphasis sic.) *Carney* at ¶ 30, citing R.C. 2901.05(B)(1) (Mar. 2019 version); *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. *See also State v. Daley*, 10th Dist. No. 19AP-561, 2020-Ohio-4390, ¶ 39; *State v. McCallum*, 10th Dist. No. 19AP-796, 2021-Ohio-2938, ¶ 37. In other words, "revisions to the law enacted shortly before the trial of th[e] case have placed the burden on the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt." *Carney* at ¶ 31.

{¶ 52} Appellant first contends appellee did not present sufficient evidence that appellant did not act in self-defense. Since briefing in this case, this court in *State v.*

---

[1] *Carney* followed the March 28, 2019 amendment to R.C. 2901.05, which, like the instant case, was enacted after the alleged crime was committed but before the trial. *See also State v. Collins*, 10th Dist. No. 19AP-373, 2020-Ohio-3126, ¶ 30 (applying March 2019 statute version where the alleged crime was committed in 2018 and the trial occurred in May 2019). We note the issue of whether the amended statute applies in such a situation is pending for review by the Supreme Court of Ohio. (*See State v. Brooks* docketed under S.Ct. Nos. 2020-1250 and 2020-1189.) We further note the Ohio legislature again amended R.C. 2901.05, and the new version of the statute was effective April 6, 2021.

*Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2044, held "sufficiency of the evidence is not the proper framework to review whether the state proved the absence of self-defense." *Id.* at. ¶ 44-45. Following *Messenger*, appellant's assignment of error pertaining to the sufficiency of the evidence in this case lacks merit and is accordingly overruled. Nevertheless, even if self-defense is appropriate for sufficiency of the evidence review on appeal,[2] the record here shows appellee provided evidence, if believed, to disprove at least one of the elements of self-defense beyond a reasonable doubt.

{¶ 53} First, appellee presented sufficient evidence that appellant was at fault in creating the situation giving rise to the affray. This court has determined that a person who leaves a fight and is not pursued, obtains a weapon, and re-engages with the people who fought him, becomes the aggressor and is generally not acting in self-defense. *See, e.g., State v. Campbell*, 10th Dist. No. 07AP-1001, 2008-Ohio-4831, ¶ 27 (finding a defendant who broke free from a fight, fled unpursued to a van at the end of a driveway, retrieved a loaded gun, walked to the front of the van, and fired the gun back at the crowd was the aggressor and supported the jury's rejection of his self-defense claim); *State v. Ellis*, 10th Dist. No. 11AP-939, 2012-Ohio-3586, ¶ 16 (holding a jury may properly find a defendant at fault for the situation giving rise to the affray where the defendant chose to enter a place where he knew the victim would be despite knowing that a confrontation might ensue and in choosing to follow the victim out of the store and engage in a further confrontation outside instead of staying inside the store and walking away from the volatile situation); *State v. Ferrell*, 10th Dist. No. 19AP-816, 2020-Ohio-6879, ¶ 30 (noting that the appellant's argument regarding his intention to retreat from the initial encounter ignores that by brandishing his gun, the appellant only escalated the situation); *Messenger* at ¶ 50-51 (following *Ellis* and *Ferrell*).

{¶ 54} Here, evidence was presented that Lundy punched appellant first. However, contrary to appellant's argument, Christian, Wright, and Calill testified that the physical fight was over, Christian's family was preparing to leave, and appellant had entered his house alone without being pursued. They testified that appellant came out of the house on his own volition with a high-powered rifle and shot at Lundy alone, who was unarmed and

---

[2] We note the Supreme Court recently accepted jurisdiction to review *Messenger* on this point. (*See* Supreme Court of Ohio Case Information No. 2021-0944.)

collecting his possessions in the yard. In other words, if believed, the testimony of Christian, Wright, and Calill showed appellant re-engaged Lundy after the physical altercation ended and escalated the confrontation by retrieving and firing a weapon.

{¶ 55} Second, the testimony above—that the physical fight was over, Christian's family was preparing to leave, and appellant had entered his house alone without being pursued—is likewise sufficient to show that appellant did not have a reasonable and honest belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape. Appellant argues that, in his interview with the detective, he called himself "defenseless," that he was "bum-rushed" by the other men, and the men were "hostile" and "aggressive" toward appellant. (Appellant's Brief at 27.) However, this argument essentially contends appellant's evidence was more credible and believable than appellee's evidence, which is an issue relevant to considering the manifest weight of the evidence, not the sufficiency of the evidence.

{¶ 56} Moreover, even if appellant was reasonable in believing the group of men at issue in this case posed a threat to him, appellee presented evidence that the men were unarmed, in the middle of his yard, preparing to leave, and were not attempting to enter or attack the residence. Such evidence is sufficient to disprove the necessity of the use of deadly force. *Carney* at ¶ 30 ("[c]onsistent with the self-defense requirement that force must be the only means of escape, a person may only use as much force as is reasonably necessary to repel the attack").

{¶ 57} Third, appellant has not demonstrated appellee failed to present sufficient evidence that appellant violated a duty to retreat or avoid the danger. The former version of R.C. 2901.09 in place at the time of trial in this case stated in relevant part:

> For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence * * *.

R.C. 2901.09(B) (Sept. 8, 2008 version).[3] "Residence" has the same meaning as stated in R.C. 2901.05: "a dwelling in which a person resides either temporarily or permanently or is visiting as a guest." R.C. 2901.09(A) (Sept. 8, 2008 version); R.C. 2901.05(D)(3) (Mar. 28,

---

[3] R.C. 2901.09 was amended, effective April 6, 2021. Appellant does not argue the new statute applies, and we decline to comment on the amended statute in this case.

2019 version). "Dwelling" is further defined as "a building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging in the building or conveyance at night, regardless of whether the building or conveyance is temporary or permanent or is mobile or immobile. As used in this division, a building or conveyance includes, but is not limited to, an attached porch, and a building or conveyance with a roof over it includes, but is not limited to, a tent." R.C. 2901.05(D)(2) (Mar. 28, 2019 version). This court has determined this former statutory definition excluded the "yard," which appellant does not argue against here. *State v. Shine-Johnson*, 10th Dist. No. 17AP-94, 2018-Ohio-3347, ¶ 33. In addition, there is a rebuttable presumption that a person acted in self-defense in using force intended or likely to cause death or great bodily harm if the injured person unlawfully entered or was in the process of unlawfully entering the residence occupied by the person using the defensive force. R.C. 2901.05(B)(2) (Mar. 28, 2019 version).

{¶ 58} Appellant cites to *State v. Claren*, 9th Dist. No. 19AP-0015, 2020-Ohio-615, without further explanation. We do not find *Claren* requires reversal on the sufficiency of the evidence here. *Claren* involved the propriety of the trial court excluding including a castle doctrine instruction where the defendant set forth evidence that he was on his front porch when he shot a person who was within two to three feet of the defendant and attempted to grab the defendant's gun. As opposed to *Claren*, in this case appellee set forth evidence that supports a theory that appellant continued to shoot at Lundy when appellant was off of the porch and in the yard, including: testimony that appellant was walking off the porch when he was firing the rifle; evidence of three spent casings found in the yard including one behind Lundy by the tree and one well into the middle of the yard; autopsy photographs showing an upward trajectory of the fatal gunshot wound through Lundy's chest; and impact holes and a bullet jacket fragment in a hole consistent with a rifle being fired from the yard at a person on or nearly on the ground. On this record, appellee presented sufficient evidence under former R.C. 2901.09(B) that appellant violated a duty to retreat or avoid the danger. *Carney* at ¶ 30.

{¶ 59} Considering all the above, and after viewing the evidence in a light most favorable to the prosecution, we find a rational trier of fact could have found the purposeful murder proven beyond a reasonable doubt, and that appellant did not act in self-defense.

{¶ 60} Appellant also contends his conviction should be reversed because the evidence weighed manifestly against convicting him of murder.  Appellant argues that "the inference that [appellant] was jumped by four grown men on his own porch was more believable and persuasive," that appellant could not defend himself because of his shoulder injury from his military service, and that appellant sustained injuries in the attack by Lundy and the other men.  (Appellant's Brief at 29-30.)  Appellant notes that Diandrea stated the group "just tried to kill my brother" shortly after the shooting occurred.  (Appellant's Brief at 30.)

{¶ 61} We disagree with appellant. First, there was overwhelming evidence that appellant was "at fault in creating the situation giving rise to the affray." *Carney* at ¶ 30, citing R.C. 2901.05(B)(1) (Mar. 2019 version).  It is undisputed that Lundy threw the first punch, and there is conflicting evidence about the subsequent involvement of Christian's brothers and Lundy's brother.  However, even assuming appellant's version of events—that the rest of the men attacked him by hitting, wrestling, and kicking him—is true, appellant does not contest that he was able to get free of the group with only minor injuries, re-enter his house unmolested, and spend about a minute inside without anyone attempting to come inside or otherwise attack his home.  The fight had ended.  While appellant in his interview with detectives stated he did not know if the men would try to come inside at some point in time, there is no evidence to suggest the group was attempting to do so.  It was appellant who re-engaged Lundy, and escalated the situation by doing so with a high-powered rifle.  As a result, appellant became the aggressor.  *Campbell* at ¶ 25-27; *Ellis* at ¶ 16; *Ferrell* at ¶ 30; *Messenger* at ¶ 50-51.

{¶ 62} Second, there was overwhelming evidence that appellant did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape.  *Carney* at ¶ 30, citing R.C. 2901.05(B)(1) (Mar. 2019 version).  Appellant again argues that, in his interview with the detective, he called himself "defenseless," that he was "bum-rushed" by the other men, and the men were "hostile" and "aggressive" toward appellant.  (Appellant's Brief at 27.)  Appellee adds that appellant told the detective that he thought Lundy was "getting ready to come at him" while the others waited on Lundy to make the first move.  (Appellee's Brief at 9, citing Appellant's Interview Ex. K.)

{¶ 63} However, in that same interview, appellant also admitted that after the initial fight no one followed him into the house or was on the porch while he was inside. As to Lundy's behavior once appellant returned outside, Christian, Wright, and Calill all testified that Lundy was preparing to leave and was not near the residence. Even if a jury member chose not to believe that testimony and instead to believe appellant that Lundy was "talking trash" and "jumping around," there is no evidence that Lundy or the other men acquired weapons or made any moves toward appellant, let alone in a manner to put appellant in fear of imminent danger of death or great bodily harm. (Appellant's Interview, Ex. K.) The undisputed evidence supports the opposite view. Appellant was armed with a high-powered rifle; Lundy was unarmed. No bullet entrance wounds were found on the front of Lundy's body: he was shot from the side or from behind. The autopsy and coroner's evidence, particularly the incapacitating nature of the wounds and the upward pathway of the bullet through Lundy's chest, tend to show appellant fired the fatal shot while Lundy was already on or near the ground. Moreover, in his interview with the detective, appellant never stated he felt like he was going to die or had no choice but to shoot Lundy. Overall, the evidence overwhelmingly shows appellant did not believe he was in imminent danger of death or great bodily harm, and such a belief would have been unreasonable on this record. The greater amount of credible evidence likewise shows the amount of force appellant used—firing a high-powered rifle at Lundy—was not reasonably necessary to repeal any perceived threat of attack appellant may have had.

{¶ 64} Third, although the failure of either of the two previous elements is dispositive and negates appellant's claim of self-defense, the jury could have also reasonably believed appellant was still shooting at Lundy while not on his porch, thereby violating a duty to retreat or avoid the danger under the former version of R.C. 2901.09 in place at the time of trial. As previously set forth, Calill testified that appellant was walking off the porch when he was firing the rifle and three spent shell casings were found in the yard including one behind Lundy by the tree and one in the middle of the yard. The autopsy photographs document an upward trajectory of the fatal gunshot wound through Lundy's chest. The impact holes and a bullet jacket fragment in a hole, while not conclusive of the location of the shooter, are consistent with a rifle being fired from the yard at a person on or nearly on the ground. Considering this evidence alongside former R.C. 2901.09, the jury

could reasonably find appellee met its burden in proving appellant violated a duty to retreat or avoid the danger. *Carney* at ¶ 30.

{¶ 65} Having reviewed the entire record, weighed the evidence and all reasonable inferences and considered the credibility of witnesses we find the jury did not clearly lose its way and create such a manifest miscarriage of justice so the conviction must be reversed and a new trial ordered.

{¶ 66} Accordingly, having found appellant's conviction to be supported by sufficient evidence and to not be against the manifest weight of the evidence, we overrule appellant's fifth and sixth assignments of error.

### B.  Jury instructions

{¶ 67} Appellant's first three assignments of error assert reversible error concerning jury instructions.  A trial court "must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder." *State v. Joy*, 74 Ohio St.3d 178, 181 (1995), citing *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus.  Conversely, "[i]t is well established that the trial court will not instruct the jury where there is no evidence to support an issue." *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991).  Thus, in reviewing a record to determine whether there is sufficient evidence to support the giving of an instruction, "an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." *Id.* at 591.

{¶ 68} "Ordinarily, a trial court has discretion to decide to give or refuse a particular instruction, and an appellate court will not disturb that decision absent an abuse of discretion." *Ferrell* at ¶ 23.  An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).  However, pursuant to Crim.R. 30(A), "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."  Thus, "[w]hen a defendant fails to object to the jury instructions, [he or] she waives all but plain error." *State v. Owens*, 162 Ohio St.3d 596, 2020-Ohio-4616, ¶ 7.  "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  Crim.R. 52(B).  "To show plain error, he must show that

(1) there was an error, (2) the error was 'plain,' i.e., obvious, and (3) the error affected substantial rights," meaning a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims. *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 217-18, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), and *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22. " ' A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice.' " *Ferrell* at ¶ 24, quoting *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.).

### 1. *The trial court did not instruct the jury that appellant had a duty to retreat*

{¶ 69} First, appellant contends his conviction must be reversed because "the trial court instructed the jury that [appellant] had a duty to retreat when he did not" have such a duty.  (Appellant's Brief at vii, 9.)  Initially, we find appellant waived all but plain error review of this issue.  At the close of evidence, appellant requested jury instruction language on the "duty to not retreat."  (Tr. Vol. IV at 987.)  Appellee pointed to language already in the instructions regarding when the duty to retreat does not apply.  The trial court found that language sufficient, and appellant did not object to that instruction.  (Tr. Vol. IV at 987-88.)  While the failure to formally object to an instruction may in some circumstances not lead to waiver, the exchange between the court and the parties here does not "affirmatively show[] the trial court was appraised of both * * * [parties] positions on the issue and the governing law."  *Claren* at ¶ 23.  We note that after the final jury instructions were distributed to the jury and the jury retired for deliberations, appellant sought to "renew [his] objection to the jury instructions in the form that they went back to the jury."  (Tr. Vol. IV at 1080.)  However, this attempt to object was both general and untimely as appellant was required to object "before the jury retires to consider its verdict" and state "specifically the matter objected to and the grounds of the objection."  Crim.R. 30(A).

{¶ 70} Regardless, we find appellant has not demonstrated error in this regard, let alone plain error. First, appellant's assignment of error is premised on the belief that "the trial court instructed the jury that [appellant] had a duty to retreat."  (Appellant's Brief at vii, 9.)  To the contrary, the trial court instructed the jury "[*u*]*nless the Defendant was in his home or place of business*, he had a duty to retreat or avoid the danger even if he was in a place where he had the right to be."  (Emphasis added.) (Tr. Vol. IV at 1067; Jury

Instructions at 9.)  As a result, appellant's first assignment of error as stated is against the record and is overruled on that basis.  *Huntington Natl. Bank v. Burda*, 10th Dist. No. 08AP-658, 2009-Ohio-1752, ¶ 21, citing App.R. 12(A)(1)(b) (stating that "a court of appeals shall * * * [d]etermine the appeal on its merits on the assignments of error set forth in the briefs") and *Williams v. Barrick*, 10th Dist. No. 08AP-133, 2008-Ohio-4592, ¶ 28 (holding that appellate courts "rule[ ] on assignments of error only, and will not address mere arguments").

{¶ 71} Moreover, even if we were to entertain appellant's arguments, we find they lack merit.  First, we disagree that *Claren* is dispositive to this case.  In *Claren*, the trial court refused to give any instruction on the "castle doctrine" obviating a person's duty to retreat before employing deadly force where the defendant shot a person from his porch. *Id.* at ¶ 24-26.  Here, the trial court did give a castle doctrine instruction, as stated above.

{¶ 72} Second, we disagree with appellant to the extent he argues the trial court should have given an instruction that appellant in this case "had no duty to retreat" without qualification.  (Appellant's Brief at 12.)  Appellee presented evidence from which the jury could reasonably infer that appellant was in the yard while still shooting at Lundy, which, as previously explained, implicates appellant's duty to retreat under the former version of R.C. 2901.09. (Appellant's Brief at 12.)  Appellant's position would require the trial court to improperly interfere with the jury's role as finder of fact on this issue.

{¶ 73} Third, the wording used by the trial court, while not mimicking the statute, adequately appraised the jury that the castle doctrine applies to a person using deadly force while located on an attached porch.  Appellant takes issue with the instruction informing the jury appellant had no duty to retreat "[u]nless the Defendant was *in* his home or place of business." (Emphasis sic.) (Appellant's Brief at 11.)  However, the word "in" appears in former R.C. 2901.09(B), which provides that a "person who lawfully is *in* that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence." (Emphasis added.)  As previously discussed, the trial court included instructions defining, for purposes of self-defense, the term "residence" as including an "attached porch." (Tr. Vol. IV at 1064 and Jury Instructions at 7.)  Appellant has not set forth an argument that the trial court's use of the word "home" versus "residence" may have impacted the jury, and we note "home" is often used interchangeably

in cases discussing the castle doctrine. *See, e.g., Claren* at ¶ 14, 24; *Collins* at ¶ 39 ("pursuant to R.C. 2901.09(B), there is no duty to retreat before using defensive force when a person is attacked in his or her own home").

{¶ 74} Finally, we do not find *State v. Jackson*, 22 Ohio St.3d 281 (1986), supports reversal and instead find it supports affirming appellant's conviction. The trial court in *Jackson* did not give a castle doctrine instruction at all even though the defendant shot a person while the defendant was on his porch or "about" his home. *Id.* at 284-85. Contrary to appellant's position, the Supreme Court of Ohio in *Jackson* does not conclude whether or not a person had a duty to retreat from their own "yard" under previous law. (Appellant's Brief at 12.) Rather, the holding in *Jackson* states that "[a]lthough a special instruction from the trial court on appellant's duty to retreat would have been appropriate to the evidence adduced at trial, * * * the failure to give such an instruction neither affected appellant's substantial rights nor contributed to his conviction." *Id.* at 285. This conclusion was based on the substantial evidence presented in the case that negated one of the other cumulative elements of self-defense. *See Id.* ("[i]t is evident that in the case *sub judice*, the jury heard the witnesses, weighed the evidence, and rejected appellant's contention that he had a bona fide belief that he was in imminent danger of death or great bodily harm").

{¶ 75} Here, like *Jackson* and as detailed in the section of this decision addressing the sufficiency and manifest weight of the evidence, there was overwhelming evidence demonstrating appellant was at fault for starting the affray after the initial fight ended and appellant did not have a bona fide belief that he was in imminent danger of death or great bodily harm when he shot Lundy. As in *Jackson*, the jury here "simply rejected" the theory of self-defense. *Id.* For all the reasons stated, reversal of appellant's conviction under the first assignment of error is unwarranted.

{¶ 76} Accordingly, the first assignment of error is overruled.

### 2. *The jury instructions, viewed as a whole, clearly convey the state's burden to disprove self-defense*

{¶ 77} Appellant next contends his conviction must be reversed because the trial court's instructions on self-defense were conflicting and confusing. As stated in *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 123:

> Jury instructions must "correctly and completely state the law."
> *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843

N.E.2d 1170, ¶ 32.  In assessing jury instructions, a reviewing court must decide not only whether the instruction at issue is correct in the abstract but also whether it is potentially misleading.  *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 52.  If an instruction is ambiguous, a reviewing court must determine " 'whether there is a reasonable likelihood that the jury has applied [it] in a way' that violates the Constitution."  *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).  And when examining instructions, an appellate court should not judge a single instruction in artificial isolation but instead should view it in the context of the overall charge.  *State v. Madrigal*, 87 Ohio St.3d 378, 396, 2000-Ohio-448, 721 N.E.2d 52 (2000).

*See also State v. Flory*, 3d Dist. No. 15-20-02, 2020-Ohio-5136, ¶ 52 ("courts have found that when a court misstates the law in its jury instructions, that fundamental fairness requires reversal under plain error analysis").  Whether jury instructions correctly state the law is a question of law that an appellate court reviews de novo.  *State v. D.H.*, 10th Dist. No. 16AP-501, 2018-Ohio-559, ¶ 43.

{¶ 78}  Appellant essentially argues that the jury instructions in the case as a whole fail to express adequately and clearly that "[u]nder the current version of R.C. 2901.05, if evidence is presented 'that tends to support' that the defendant used force in self-defense, the *state* must prove beyond a reasonable doubt that the accused did not act in self-defense."  (Emphasis sic.) (Appellant's Brief at 13.)  Appellant points to the section of the instructions where the trial court states: "[t]he Defendant raises the affirmative defense known as self-defense."  (Tr. Vol. IV at 1063.)  Appellant believes it was improper for the trial court to then continue to state "a defendant is 'not in the position to claim self-defense' if he provoked [the fight]" or was the aggressor.  (Appellant's Brief at 15, quoting Tr. Vol. IV at 1066, 1068.)  In appellant's view, the jury was left with confusing and contradictory instructions regarding the burden of self-defense, and in convicting him, "the jury may well have thought that [appellant] could not 'claim' the 'defense.' "  (Appellant's Brief at 16, citing former R.C. 2901.05.)

{¶ 79}  Incorrect or confusing statements in jury instructions regarding whether the defendant or the state bears the burden of establishing a defense can be cause to reverse a defendant's conviction and order a new trial.  *See generally Flory*.  In *Flory*, the Third

District Court of Appeals reversed a defendant's conviction where the jury was given an incorrect and contradictory instruction that was not in compliance with the March 2019 version of R.C. 2901.05(B)(1) placing the burden of proof on the state. In that case, the jury was given the correct instruction that the state has to disprove self-defense beyond a reasonable doubt, but also "clearly stat[ed] in several instances that [the defendant] had to establish self-defense by a preponderance of the evidence." *Id.* at ¶ 54.

{¶ 80} Here, unlike *Flory*, the jury instructions do not state that appellant had to establish self-defense or do so by a preponderance of the evidence. Moreover, the instructions repeatedly emphasized that appellee had the burden to disprove self-defense in order to secure a conviction for murder:

> The Defendant raises the affirmative defense known as self-defense.
>
> * * *
>
> When a claim of self-defense is raised, the State must prove beyond a reasonable doubt that the Defendant did not use the force in self-defense.
>
> * * *
>
> The previously defined instruction on self-defense also applies to murder as charged in Count Two of the indictment. If you find that, (1), the State proved beyond a reasonable doubt all the essential elements of the offense of murder and you also find that, (2), the State of Ohio proved beyond a reasonable doubt that the Defendant did not use the force in self-defense, then you must find the Defendant guilty of the offense of murder. However, even if you find that the State proved beyond a reasonable doubt all of the essential elements of murder, but you also find that the State failed to prove beyond a reasonable doubt that the Defendant did not use the force in self-defense, then you must find the Defendant not guilty of murder.

(Tr. Vol. IV at 1063, 1067, 1069-70.) The instructions repeated the state's burden in relation to the aggravated murder charge, and also specified, "[f]or you to find the Defendant guilty, the State must prove beyond a reasonable doubt that the Defendant used more force than reasonably necessary and that the force used was greatly disproportionate to the apparent danger." (Tr. Vol. IV at 1065-66). On this record, we find *Flory* distinguishable.

{¶ 81} To the extent appellant additionally argues the statement appellant "raise[d] the affirmative defense known as self-defense" does not accurately reflect the law, we note

our recent decision in *Messenger* supports this instruction. (Tr. Vol. IV at 1063.) Messenger at ¶ 44 ("[u]nder the [March 2019] version of R.C. 2901.05, while the burden of *proof* for the affirmative defense of self-defense has shifted to the state, the burden of *production* for all affirmative defenses, including self-defense, remains with the defendant"). (Emphasis sic.) *See also State v. Parrish*, 1st Dist. No. C-190379, 2020-Ohio-4807, ¶ 10-13 (stating that it "must determine whether [the defendant] met her burden of production under the amended [R.C. 2901.05(B)(1)] statute" and disagreeing that the defendant has a reduced burden to place at issue the use of force in self-defense due to the "tends to support" phrase in R.C. 2901.05(B)(1)). Regardless, the statement that appellant had (successfully) "raise[d] the affirmative defense known as self-defense" undermines appellant's argument that the jury may have thought appellant could not claim self-defense. (Tr. Vol. IV at 1063.)

{¶ 82} Viewed as a whole, we do not find the jury instructions failed to adequately express the state's burden of proof under the March 2019 version of R.C. 2901.05, were otherwise conflicting or confusing, or misled the jury on these points. *See Wilks* at ¶ 123 (finding jurors were unlikely to have been misled by an instruction that was ambiguous when read in isolation since the instructions also correctly articulated the state's burden of proof); *State v. Calderon*, 10th Dist. No. 05AP-1151, 2007-Ohio-377, ¶ 55, quoting *Toth v. Oberlin Clinic, Inc.,* 9th Dist. No. 01CA007891, 2002-Ohio-2211, ¶ 45 (finding that if the instructions, taken in their entirety, " 'fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled' ").

{¶ 83} Accordingly, because reversal of appellant's conviction is not warranted due to conflicting and confusing jury instructions as argued by appellant, the second assignment of error is overruled.

### 3. The evidence presented at trial did not warrant a voluntary manslaughter instruction

{¶ 84} Appellant contends the trial court committed reversible error by refusing to give a voluntary manslaughter instruction. R.C. 2903.03 defines the crime of voluntary manslaughter as follows:

> No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious

> provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.

"Voluntary manslaughter is an inferior degree of murder." *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). "[A] defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." *Id.* This test does not mean an instruction is warranted any time there is "some evidence" presented supporting voluntary manslaughter. *Id.* at 632-33.

{¶ 85} "The test for voluntary manslaughter includes both an objective and a subjective component." *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 153. For the objective component, "a fact-finder must determine whether a serious provocation occurred and whether that provocation was 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.' " *Id.*, quoting *Shane* at 635. For the subjective component, "the fact-finder must evaluate whether 'this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage.' " *Id.*, quoting *Shane* at 634. A defendant being tried for murder must prove the mitigating circumstances of R.C. 2903.03(A) "by a preponderance of the evidence." *Thompson* at ¶ 153, citing *State v. Rhodes*, 63 Ohio St.3d 613, 620 (1992).

{¶ 86} Appellant concedes that an instruction on voluntary manslaughter is generally incompatible with a theory of self-defense, but contends "there is no blanket rule" to this effect and believes appellant presented sufficient evidence at trial to warrant the voluntary manslaughter instruction. (Appellant's Brief at 18.) As evidence that appellant acted under the influence of sudden passion or a fit of rage brought on by sufficient provocation, appellant cites to: Lundy and three grown men coming to appellant's house and all "jump[ing]" him; appellant being punched while he was defenseless due to his shoulder injury; the 30 second to 1 minute timeframe between appellant going into the house and returning outside with the rifle; the continued hostile and aggressive environment when appellant was outside, even with the rifle; and testimony from an officer and Christian that after the shooting appellant was "physically upset" and "angry." (Appellant's Brief at 20.)

{¶ 87} We disagree with appellant. Regarding the objective element, even viewing the evidence in a light favorable to appellant, Lundy "jumping around" and "talking trash" to appellant in an aggressive manner is not a provocation reasonably sufficient to incite an ordinary person to use deadly force. (Tr. Vol. IV at 932-33; Ex. K.) *Shane* at 637 ("[W]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations.").

{¶ 88} Moreover, even if the circumstances here present objectively reasonable provocation, there was no evidence that at the time appellant shot Lundy he was actually under the influence of sudden passion or in a sudden fit of rage. Christian testified that appellant seemed angry but not out of control during two post-shooting encounters; as to appellant's demeanor during the shooting Christian testified appellant was not out of control. An officer testified that appellant seemed physically upset after the shooting while being secured by officers but was cooperative and complied with orders. Appellant in his interview with a detective denied having been out of control or very angry when he shot Lundy. Rather, appellant expressed concern that Lundy and the others were not leaving the yard and were acting hostile and aggressive; he stated he got the gun for his own safety because he felt defenseless. Almost all the evidence cited by appellant speaks to his fear that Lundy and the other men would harm him. For purposes of the subjective component, on the facts presented here, the appellant's fear for his own personal safety does not constitute sudden passion or fit of rage. *Collins* at ¶ 51. ("[S]elf-defense on the one hand requires a showing of fear, whereas voluntary manslaughter requires rage."); (Citation omitted.) *Thompson* at ¶ 157 (noting that fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage).

{¶ 89} We do not find the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter. *Shane* at 632-33. The trial court acted within its discretion by declining to give a voluntary-manslaughter instruction based on this evidence.

{¶ 90} Accordingly, appellant's third assignment of error is overruled.

### C.  Prosecutorial misconduct

{¶ 91} Appellant contends the prosecution's misconduct in this case caused prejudicial error, requiring reversal of appellant's murder conviction. When reviewing

allegations of prosecutorial misconduct, an appellate court "must determine (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected [the defendant's] substantial rights." *State v. LaMar*, 95 Ohio St. 3d 181, 2002-Ohio-2128, ¶ 121. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209 (1982). *Thompson* at ¶ 162. An appellate court "will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even" absent the misconduct. *LaMar* at ¶ 121. Appellant did not object to the alleged instances of misconduct, thereby waiving all but plain error review. Crim.R. 52.

{¶ 92} Appellant contends the prosecutor committed misconduct by referring to appellant as a "murderer." (Appellant's Brief at 23.) Appellant references one statement in appellee's closing argument ("[appellant] murdered [Lundy]") and three statements during questioning of witnesses: "Now, would you compare what you had for lunch 3 years ago the same as watching James Lundy be murdered * * *?"; "Did you ever detract * * * from what you basically had told [the detective regarding] in terms of who murdered James Lundy?"; and "Up until the day he was murdered by [appellant]". (Tr. Vol. III at 673, 676, 782.)

{¶ 93} Appellant fails to demonstrate error, let alone plain error in this regard. Appellant cites case law establishing that a prosecutor may not express personal opinions about guilt or innocence of the accused but does not cite cases to support his position that the prosecutor's statements here fall into this category. Rather, appellant concedes a prosecutor's comments of this sort have "spawned debate" and not always risen to the level of misconduct. (Appellant's Brief at 22.) Moreover, as noted by appellee, "murder" is a legal term referring to a person who purposely causes the death of another, and appellant at trial did not dispute he fit this definition: the evidence undisputedly showed appellant aimed a high-powered rifle at Lundy and pulled the trigger multiple times. R.C. 2903.02(A). Whether appellant was ultimately justified for purposefully shooting Lundy hinged on the self-defense issue.

{¶ 94} Overall, appellant has not demonstrated the statements in this case express the prosecutor's opinion of appellant's guilt or otherwise constitute misconduct. *State v.*

*Sims*, 10th Dist. No. 14AP-1025, 2016-Ohio-4763, ¶ 11 (stating general rule that an appellant bears the burden of affirmatively demonstrating error on appeal); App.R. 16(A)(7) and 12(A)(2); *State v. Smith*, 9th Dist. No. 15AP0001n, 2017-Ohio-359, ¶ 22 (noting it is not the duty of an appellate court to create an argument on appellant's behalf). Moreover, in light of the substantial evidence presented at trial indicative of appellant's guilt, detailed earlier in this decision, we find that the prosecutor's statements were not prejudicial to appellant. *See State v. Lynn*, 7th Dist. No. 96 C.A. 183 (Mar. 17, 1999) (finding prosecutor's statement, "[w]ithin one hour they had the murderer and they had the murder weapon" to not constitute the prosecutor's personal opinion on guilt and to not prejudicially affect the defendant due to the substantial evidence in the case.).

{¶ 95} Appellant next argues the prosecutor misled the jury by misstating the law in appellee's closing argument by telling the jury multiple times that appellant had a duty to retreat when he did not have such a duty and, relatedly, by misstating the facts by telling the jury appellant shot Lundy while standing directly over him in the yard. (Tr. Vol. IV at 1002, 1004, 1035-36.) " 'The prosecuting attorney does not instruct the jury on the law, the trial judge does.' " *Shine-Johnson* at ¶ 74, quoting *State v. Palmer*, 7th Dist. No. 89-B-28 (Aug. 29, 1996). "However, a prosecuting attorney should not mislead the jury by either misstating the law or the facts." *Id.*

{¶ 96} To disprove self-defense, the state may show the defendant violated a duty to retreat before resorting to deadly force. *Carney* at ¶ 30, citing R.C. 2901.05(B)(1) (Mar. 2019 version). Appellant's position is that he had no duty to retreat since he was "either right within his home, or on his porch" when he fired at Lundy. (Appellant's Brief at 25.)

{¶ 97} As previously discussed, the former R.C. 2901.09(B) stated, in relevant part, "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence." R.C. 2901.09(B) (Sept. 2008 version). The definition of "residence" included an "attached porch" but not a "yard." R.C. 2901.09(A) (Sept. 2008 version); R.C. 2901.05(D)(2) and (3) (Mar. 28, 2019 version); *Shine-Johnson* at ¶ 33. Appellee produced evidence from which the jury could reasonably find appellant continued to shoot at Lundy while appellant exited the porch and entered the yard. Calill testified that appellant was walking off the porch when he was firing

the rifle, three spent shell casings were found in the yard including one behind Lundy by the tree and one in the middle of the yard, the autopsy photographs document an upward trajectory of the fatal gunshot wound through Lundy's chest, and the impact holes and a bullet jacket fragment in a hole are consistent with a rifle being fired from the yard at a person on or nearly on the ground.  We find the prosecutor's comment during closing, "Is [the evidence] not consistent with standing over James Lundy and shooting him?" and statements generally pursuing a theory that appellant violated a duty to retreat or avoid the danger to be based on evidence presented at trial and not contrary to the law in place at the time of trial.

{¶ 98} However, we agree with appellant that to the extent the prosecutor during closing argument stated or implied appellant violated a duty to retreat by exiting the four walls of his house and entering his front porch, this was an incorrect statement of law.  *See* R.C. 2901.09(A) (Sept. 2008 version); R.C. 2901.05(D)(2) and (3) (Mar. 2019 version) (collectively establishing that a person has no duty to retreat if "in that person's residence," including an attached porch).  Nevertheless, the prosecutor's improper conduct did not prejudicially affect appellant's substantial rights in this case.

{¶ 99} In the context of the entire trial, it does not appear clear beyond a reasonable doubt that the jury would have found the defendant guilty even absent the misconduct. *LaMar* at ¶ 121.  Appellee had the burden to disprove just one of the elements of self-defense. *Carney* at ¶ 31.  Appellee presented overwhelming evidence that appellant was at fault in creating the situation giving rise to the affray and did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, thereby disproving the two other elements of self-defense. Therefore, contrary to appellant's position, reversal of appellant's conviction is not warranted due to prosecutorial misconduct.

{¶ 100}     Accordingly, appellant's fourth assignment of error is overruled.

### D. Cumulative error

{¶ 101}     Appellant contends his conviction should be reversed due to multiple errors, which cumulatively caused him prejudice.  "Although errors at trial singularly 'may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial.' " *Ferrell*

at ¶ 42, quoting *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. Here, appellant has not demonstrated multiple errors occurred in this case. Therefore, the cumulative error principle is inapplicable. *Shine-Johnson* at ¶ 118. Moreover, considering the evidence in this case, we disagree with appellant's assertion that he was denied a fair trial.

{¶ 102}        Accordingly, appellant's seventh assignment of error is overruled.

## IV.    CONCLUSION

{¶ 103}        Having overruled appellant's seven assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and MENTEL, JJ., concur.

_____